UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. __20-80072-CR-Marra/Matthewman__

18 U.S.C. § 371
18 U.S.C. § 1001

UNITED STATES OF AMERICA,

vs.

LAURA LUZ MARIA TORRES ROMERO,
        a/k/a "Antonieta Vinkelried"
        a/k/a "Antonieta Winkelried"
        a/k/a "Antonieta Mena," and
MELANIE WILHELM,

_____Defendants._____/

FILED BY ___KJZ___ D.C.

Oct 23, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## INFORMATION

The United States Attorney charges that:

## GENERAL ALLEGATIONS

At all times relevant to this Information:

### A. Asylum Process

1.    The United States Citizenship and Immigration Services ("USCIS") was an agency of the United States Department of Homeland Security responsible for receiving and adjudicating immigrant and non-immigrant applications and petitions, including Form I-589, Application for Asylum and Withholding of Removal ("asylum application"), Form I-765, Application for Employment Authorization, and Form EOIR-42B, Application for Cancellation of Removal.

2.    Asylum status was a form of protection available to eligible nonimmigrants present in the United States.   To be eligible for asylum status an alien had to establish that he was unable or unwilling to return to his country of nationality or residence because

of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion.   To apply for asylum, an individual was required to file an asylum application with USCIS, within one year of the individual's arrival in the United States.   An application filed after the one-year period would be denied unless the applicant established changed circumstances that materially affected the applicant's asylum eligibility or extraordinary circumstances that caused the delay in filing.

3.     The asylum application required the applicant to provide, among other things, information about the applicant's family and a "detailed and specific account of the basis of [the] claim to asylum."   The applicant was required to sign the application under penalty of perjury, certifying that the information contained therein was true and correct.

4.     If the asylum application was prepared by someone other than the applicant or the applicant's immediate family member, that person ("the preparer") was also required to sign the application and declare that the information contained therein was true based upon the preparer's personal knowledge or information provided to the preparer by the applicant.   In addition, the preparer had to certify that the preparer had read the completed application to the applicant in the applicant's native language or a language the applicant could understand for verification before the alien signed the application in the preparer's presence.

5.     When USCIS received an asylum application, they conducted various record checks and then scheduled the applicant for an interview with an asylum officer. At the interview, the applicant was permitted to present documents to bolster the applicant's asylum claim.   After the interview, the asylum officer made a determination

to either grant asylum or refer the applicant to an immigration judge for final determination. The immigration judge would conduct a hearing on the applicant's claim and either deny or grant the application.  If the judge denied the asylum application, the judge would issue an Order of Removal, requiring the applicant to leave the United States.  If an applicant had family in the United States and met certain requirements, including residing in the United States continuously for ten years, the applicant could challenge the removal by filing an Application for Cancellation of Removal.

6.      If an asylum application was pending for 150 days or more, the applicant was eligible to apply for permission to work in the United States, by filing an application for employment authorization.   In such situations, USCIS would automatically grant the application for employment authorization and issue an Employment Authorization Document, also known as a "work permit," without evaluating the merits of the pending asylum claim.   This procedure allowed an asylum applicant to continue working during the pendency of the asylum process.   If the application for employment authorization was prepared by someone other than the applicant, the preparer was required to sign the application, certifying under penalty of perjury, that the information contained therein was true and correct.

**B. The Immigration Business**

7.      El Latino Multiservices, Inc., M&K Multiservices, Inc., L&L Document Services, Inc., and AYE Services, Inc. (hereinafter referred to collectively as "the immigration business") were Florida corporations purportedly in the business of providing immigration assistance and other services to the public.   The business operated from store fronts located in Lake Worth and West Palm Beach, Florida.

### C. The Defendants

8.     Defendant **LAURA LUZ MARIA TORRES ROMERO** (hereinafter **TORRES**) was the true owner of the immigration business.   **TORRES** controlled all aspects of the business and directed its day to day operations.   **TORRES** also controlled, either directly or indirectly through nominees, all of the corporate bank accounts.

9.     Defendant **MELANIE WILHELM** was hired by **TORRES** to serve as her assistant at the immigration business.   Under **TORRES'** direction, **WILHELM** did the bookkeeping, billing, payroll, and banking for the immigration business.   Although **WILHELM** had no control over the operation or finances of the immigration business, she agreed to let **TORRES** list her as a corporate officer on the corporate documents and as a signatory on the bank accounts.   At **TORRES'** direction, **WILHELM** prepared some of the false asylum and work permit applications and created many of the fraudulent supporting documents for the cancellation of removal applications.

### COUNT 1
### (18 U.S.C. § 371: Conspiracy)

10.     The General Allegations section is re-alleged and incorporated as though fully set forth herein.

11.     From in or around 2012, and continuing through in or around March, 2020, the exact dates being unknown to the United States Attorney, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**LAURA LUZ MARIA TORRES ROMERO,**
a/k/a **"Antonieta Vinkelried,"**
a/k/a **"Antonieta Winkelried,"**
a/k/a **"Antonieta Mena,"**
and
**MELANIE WILHELM,**

did knowingly and willfully combine, conspire, confederate and agree with each other, and with others known and unknown to the United States Attorney to commit offenses against the United States, as follows:

a. to knowingly defraud the United States by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful governmental functions of USCIS in its administration of immigration benefits programs, in violation of Title 18, United State, Section 371;

b. to knowingly subscribe as true under penalty of perjury false statements with respect to material facts in applications, affidavits, and other documents required by the immigration laws and regulations prescribed thereunder, and to knowingly present such applications, affidavits, and other documents which contained such false statements and which failed to contain any reasonable basis in law or fact, in violation of Title 18, United States Code, Sections 1546(a); and

c. to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property from clients of the immigration business, by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and did knowingly cause to be delivered by the

5

United States mail any matter or thing, according to the direction thereon, for the purpose of executing such scheme and artifice and attempting to do so, in violation of Title 18, United States Code, Section 1341.

All in violation of Title 18, United States Code, Section 371.

## PURPOSE OF THE CONSPIRACY

12.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by fraudulently procuring work permits from USCIS for ineligible aliens through the submission of false and fraudulent asylum and employment authorization applications.

## MANNER & MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

13.     **TORRES** operated storefronts in West Palm Beach and Lake Worth, Florida, which offered, among other things, immigration services to the public.

14.     **TORRES** solicited immigration clients primarily by word of mouth.   Most of the clients who sought her assistance had illegally entered the United States many years earlier and were ineligible for asylum benefits.

15.     **TORRES** told the clients they were eligible for work permits and legal status and made up fictitious programs under which they purportedly qualified for such benefits, including the "Law of 10 Years Program," if they had been in the United States for ten years or more, and the "Family Reunification Program," if they had children in the United States.

16.     **TORRES** obtained background information from the clients to complete the initial sections of the asylum application.   **TORRES** never asked the clients if they had suffered persecution in their native countries or if they were unable or unwilling to return to their native countries because of persecution based on race, religion, nationality, membership in a particular social group or political opinion.

17.     **TORRES** used the background information obtained from the clients to complete the initial sections of the asylum application.   In the section where the clients were required to provide a detailed and specific account of their asylum claim, **TORRES** knowingly made up false and fictitious narratives of persecution the clients had purportedly suffered in their native countries.   Most of the applications contained similar, and at times identical, stories of persecution.   For example, most of **TORRES'** applications falsely stated that drug cartels and/or gangs had terrorized the client's village, beaten the client, forced him to sell drugs, and threatened to kill him if he refused to join the cartel or gang.

18.     **TORRES** did not show the false and fraudulent asylum applications to the clients.   **TORRES** presented some clients with the signature page only and requested they sign the certification in blank.   More often, **TORRES** or a co-conspirator would simply forge the client's name in the certification section of the asylum application.

19.     **TORRES** never completed or signed the preparer section of the asylum application in order to conceal from USCIS her role in preparing the false applications.

20.     **TORRES** required her clients to pay up-front, cash fees for her services. **TORRES'** fees varied from client to client and increased as the scheme went on, but

typically ranged from $2,500 to $4,000 for the initial application.   **TORRES, WILHELM,** or a co-conspirator collected the cash fees from the clients.

21.     **TORRES, WILHELM**, or a co-conspirator mailed the false and fraudulent asylum applications to USCIS by the United States Postal Service.

22.     **TORRES** also prepared asylum applications for out of state clients.   With these clients, she falsely listed a local address which she owned or controlled as the mailing address so she would receive all correspondence from USCIS.   In some instances, **TORRES** charged the out of state clients "rental fees" for the local addresses she fraudulently used on their applications.   The "rents" ranged from $150 per month to $400 per month.   **TORRES** collected "rental fees" from some out of state clients for up to two years.

23.     After waiting the requisite 150 days, **TORRES** prepared applications for employment authorization for the clients, claiming they were eligible for work permits based on pending asylum applications.   **TORRES, WILHELM**, or another co-conspirator mailed the applications to USCIS *via* the United States Postal Service.   **TORRES** falsely listed her office address as the mailing address on these applications so she would receive the work permits and all USCIS correspondence.

24.     **TORRES** concealed from USCIS that she had prepared the fraudulent applications for employment authorization by leaving the preparer section blank.   In almost all instances, **TORRES** or one of her co-conspirators forged the clients' names on the employment applications.

25.     When the work permits arrived, **TORRES** demanded additional fees from the clients.   These additional fees would range from approximately $1,500 to $4,500.   If

a client declined to pay the additional fee, **TORRES** threatened to return the client's work permit which, she claimed, would lead to the client's arrest and deportation.

26.    **TORRES** directed the clients to use their work permits to obtain Social Security cards and to provide her with copies of the Social Security cards.

27.    **TORRES** or a co-conspirator met with the clients at her office to prepare them for their asylum interviews.   At the meetings, the clients saw the false asylum applications for the first time.   **TORRES** reviewed the applications with the clients and directed them to memorize the details of the false asylum claims.   **TORRES** warned the aliens they would not be permitted to stay in the United States if they did not tell the asylum officer exactly what was written in the application.

28.    **TORRES** or a co-conspirator notified the clients when their work permits were about to expire and offered to renew them, in return for additional fees.   **TORRES** warned the clients they would be deported if they failed to renew their work permits.

29.    In most instances, the clients' asylum applications were denied by an immigration judge.   **TORRES** would file Cancellation of Removal applications for some clients, in return for additional fees.

30.  **TORRES, WILHELM** and other co-conspirators created and submitted *via* the United States Postal Service to USCIS false and fictitious documents, including fake letters from doctors and pastors, fake day care records, fake leases, and fake utility bills, in support of the Cancellation of Removal applications.

31.    During the course of the conspiracy, **TORRES, WILHELM**, and their co-conspirators prepared and submitted to USCIS approximately 1,000 falsely subscribed asylum and employment applications containing materially false statements, which

caused USCIS to issue hundreds of work permits to ineligible aliens. In addition, **TORRES, WILHELM** and their co-conspirators deceived and misled hundreds of clients by promising to provide them with legitimate immigration services and instead filing false immigration applications in their names and providing them with fraudulently procured work permits. As a result, **TORRES, WILHELM** and their co-conspirators collected approximately $2.2 million in cash fees from the clients

## OVERT ACTS

32.    In furtherance of the conspiracy and to accomplish the purpose and objects thereof, the defendants and their co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

a.    On or about August 19, 2014, **WILHELM** hand-delivered to USCIS a package containing false and fictitious documents in connection with client 1's Cancellation of Removal application.

b.    On or about August 8, 2016, **TORRES** submitted or caused to be submitted to USCIS an application for employment authorization on behalf of client 2.

c.    On or about April 24, 2017, **TORRES** submitted or caused to be submitted to USCIS an application to renew client 3's employment authorization.

d.    On or about November 27, 2017, **TORRES** submitted and caused to be submitted to USCIS an asylum application on behalf of client 4.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT 2</u>
**(18 US.C. § 371: Conspiracy)**

33.     Paragraphs seven through nine of the General Allegations section are re-alleged and incorporated as though fully set forth herein.

34.     From in or around 2011, and continuing through in or around April, 2019, the exact dates being unknown to the United States Attorney, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendants,

**LAURA LUZ MARIA TORRES ROMERO,**
a/k/a "Antonieta Vinkelried,"
a/k/a "Antonieta Winkelried,"
a/k/a "Antonieta Mena,"
**and**
**MELANIE WILHELM,**

did knowingly and willfully combine, conspire, confederate and agree with each other, the co-conspirator attorney, and others known and unknown to the United States Attorney to commit offenses against the United States as follows:

a.      to knowingly embezzle, steal, purloin, and convert to their own use and the use of others money and a thing of value of the United States and a department and agency thereof, of a value exceeding $1,000, that is, United States Department of Treasury refund checks payable to others and to which they were not entitled, in violation of Title 18, United States Code, Section 641; and

b.      to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing the property involved in the financial transactions represents the proceeds of some form of unlawful activity, and knowing that such transactions were designed in whole and in part to conceal and disguise the nature,

11

location , source, ownership, and control of the proceeds, in violation of Title 18, United State Code, Sections 1956(a)(1)(B)(i).

## PURPOSE OF THE CONSPIRACY

35.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unjustly enrich themselves by (a) preparing and filing with the Internal Revenue Service (IRS) materially false and fraudulent income tax returns, claiming approximately $1.8 million dollars in refunds, and (b) concealing their receipt of and control over the fraudulently obtained tax refunds by funneling the refunds through a TD bank account set up under a stolen identity and through the co-conspirator attorney's trust account.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object of the conspiracy included the following:

36.     **TORRES** and co-conspirators obtained personal identifying information, including names, dates of birth, and social security numbers, from immigration clients ("clients");

37.     Without the knowledge or consent of the clients, **TORRES** used their personal identifying information to prepare false and fraudulent tax returns, seeking significant refunds.   The returns included one or more materially false statements, including false addresses, fake education credits, fictitious dependents, false childcare and earned income credits, and false business income, expenses and deductions. **TORRES** and the co-conspirators forged the clients' names on the fraudulent tax returns;

38.     **TORRES, WILHELM** and the co-conspirators created and submitted to the IRS false and fictitious documents, including fake leases, fake childcare receipts, and fake business receipts, in support of the false and fraudulent tax returns;

39.     The first few years of the scheme, **TORRES** directed the IRS to direct deposit the fraudulent refunds into a TD bank account, which **TORRES** opened using a stolen identity.   Later in the scheme, **TORRES** had the IRS mail the fraudulent refund checks to the "home addresses" listed on the returns.   These "home addresses" were in fact properties owned and/or controlled by **TORRES.**

40.     **WILHELM** and the co-conspirators would retrieve the fraudulent tax refund checks from the home addresses listed on the returns and deliver them to **TORRES**.

41.     **TORRES, WILHELM** and other co-conspirators forged the names of the clients on the back of the refund checks.

42.     To conceal her receipt of and control over the refund checks, **TORRES** arranged to have the co-conspirator attorney in California launder the refund checks through her trust account, in return for a 10 percent fee.

43.     The co-conspirator attorney issued checks drawn on her trust account for 90 percent of the value of the refund check.   At **TORRES'** direction, the co-conspirator attorney made the checks payable to companies **TORRES** owned or controlled.   The checks were mailed to **TORRES'** office in the Southern District of Florida.

44.     **TORRES, WILHELM** or another co-conspirator would deposit the checks issued by the co-conspirator attorney into business accounts controlled by **TORRES**. The monies from the checks were withdrawn from the accounts by ATM withdrawals,

checks and/or wire transfers and used by **TORRES** to benefit herself, **WILHELM** and the other co-conspirators.

45.     During the course of the tax and money laundering scheme, **TORRES** filed hundreds of false tax returns with the IRS, seeking refunds totaling approximately $1.8 million.

## <u>OVERT ACTS</u>

46.     In furtherance of the conspiracy and to accomplish the purpose and objects thereof, the defendants and their co-conspirators committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

a.     On or about January 19, 2017, **TORRES** deposited or caused to be deposited a check for $5,186.70, drawn on the co-conspirator attorney's trust account, payable to M&K Multiservices, into a Suntrust account ending in 0398, in the name M&K Multiservices.

b.     On or about April 20, 2017, **TORRES, WILHELM,** or a co-conspirator mailed a fraudulently obtained tax refund check, for $2,944.88, issued in the name of client 1, to a co-conspirator in California.

c.     On or about September 20, 2019, **TORRES** caused the IRS to mail a tax refund check for $8,327.72, issued in the name of client 4, to 3016 Stanford Road, a property owned by **TORRES** and rented to **WILHELM**.

All in violation of Title 189, United States Code, Section 371.

## COUNT 3
## (18 US.C. § 1001: False Statement)

47.      On or about March 12, 2018, in Palm Beach County, in the Southern District

of Florida, the defendant,

### LAURA LUZ MARIA TORRES ROMERO,
#### a/k/a "Antonieta Vinkelried,"
#### a/k/a "Antonieta Winkelried,"
#### a/k/a "Antonieta Mena,"

in a matter within the jurisdiction of the United States Department of Agriculture, a

department of the executive branch of the Government of the United States, did knowingly

and willfully make, and cause to be made, materially false, fictitious and fraudulent

statements and representations, in that, in a recertification application to establish

continued eligibility for food benefits, submitted to the Florida Department of Children and

Families, acting on behalf of USDA, the defendant stated that her name was "Antonieta

A. Mena," that she was a United States Citizen, that her household consisted of six

persons, that none of the six members of the household owned assets, that the only

household income was the defendant's monthly Social Security disability payment, and

that she paid monthly rent of $1,200, when in truth and in fact, and as the defendant then

and there well knew, her name was not "Antonieta A. Mena," she was not a United States

citizen, she did not have six people living in her household, she and other members of

the household did own assets, she earned significantly more income than her monthly

Social Security disability payments, and she did not pay monthly rent of $1,200, in violation of Title 18, United States Code, Section 1001(a)(2).

## FORFEITURE ALLEGATIONS

48.     The allegations of this Information are re-alleged and by this reference fully incorporated herein for alleging criminal forfeiture to the United States of America of certain property in which the defendant, **LAURA LUZ MARIA TORRES ROMERO, a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried, a/k/a Antonieta Mena,** has an interest.

49.     Upon the conviction of a violation of, or a conspiracy to violate, Title 18, United States Code, Section 1546, as alleged in this Information, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(6), the following property:

(a)     any conveyance, including any vessel, vehicle, or aircraft used in the commission of such violation; and

(b)     any property, real or personal –

(1)     that constitutes, or is derived from or is traceable to the proceeds obtained directly or indirectly from the commission of such violation; or

(2)     that was used to facilitate, or was intended to be used to facilitate, the commission of such violation.

50.     Upon the conviction of a violation of, or a conspiracy to violate, Title 18, United States Code, Section 1341, as alleged in this Information, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section

982(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

51.     Upon the conviction of a violation of, or a conspiracy to violate, Title 18, United States Code, Section 641, as alleged in this Information, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

52.     Upon the conviction of a violation of, or a conspiracy to violate, Title 18, United States Code, Section 1956, as alleged in this Information, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such violation, or any property traceable to such property.

53.     The property which is subject to forfeiture includes, but is not limited to, the following real property known and numbered as indicated, to include all improvements, appurtenances, attachments and fixtures thereon:

(a)     1103 Green Pine Boulevard, D-1, West Palm Beach, Florida;
(b)     5211 Kim Court, West Palm Beach, Florida;
(c)     807 Belvedere Road, West Palm Beach, Florida;
(d)     3331 Lake Avenue, West Palm Beach, Florida;
(e)     1408 Parterre Drive, West Palm Beach, Florida;
(f)     1229 Creek Side Drive, Wellington, Florida;
(g)     621 Hudson Road, West Palm Beach, Florida;
(h)     716 Briggs Street, West Palm Beach, Florida;
(i)     911 Green Street, West Palm Beach, Florida;
(j)     732 Forest Hill Boulevard, West Palm Beach, Florida;
(k)     4524 Gun Club Road, Suite 103, West Palm Beach, Florida; and
(l)     9434 Pinto Drive, Lake Worth, Florida

All pursuant to Title 18, United States Code, Sections 982(a)(1), and (a)(6), Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined at Title 21, United States Code, Section 853.

_____ for

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

_____

ADRIENNE RABINOWITZ
ASSISTANT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

LAURA LUZ MARIA TORRES ROMERO, et al.

_____Defendant._____/

CASE NO.___ 20-80072-CR-Marra/Matthewman

## CERTIFICATE OF TRIAL ATTORNEY*

Superseding Case Information:

**Court Division:** (Select One)
___ Miami ___ Key West
___ FTL  ✓  WPB ___ FTP

New defendant(s)          Yes _____  No _____
Number of new defendants  _____
Total number of counts    _____

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:   (Yes or No)   Yes___
   List language and/or dialect   Spanish_____

4. This case will take _1**_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)

   |     |              |     |
   |-----|--------------|-----|
   | I   | 0 to 5 days  | ✓   |
   | II  | 6 to 10 days |     |
   | III | 11 to 20 days|     |
   | IV  | 21 to 60 days|     |
   | V   | 61 days and over |  |

   (Check only one)

   |          |     |
   |----------|-----|
   | Petty    |     |
   | Minor    |     |
   | Misdem.  |     |
   | Felony   | ✓   |

6. Has this case previously been filed in this District Court?   (Yes or No)   No___
   If yes: Judge_____   Case No._____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   Yes___
   If yes: Magistrate Case No.   20-mj-8229-DLB_____
   Related miscellaneous numbers:   19-8220 through 19-8223-WM, 20-8246-WM
   Defendant(s) in federal custody as of   _____
   Defendant(s) in state custody as of   _____
   Rule 20 from the District of   _____

   Is this a potential death penalty case? (Yes or No)   No___

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?   Yes _____   No _✓_

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   Yes _____   No _✓_

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   Yes _____   No _✓_

ASSISTANT UNITED STATES ATTORNEY
ADRIENNE RABINOWITZ

*Penalty Sheet(s) attached;
** Based on plea agreement.

REV 6/5/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:   **LAURA LUZ MARIA TORRES ROMERO,**
**a/k/a Antonieta Vinkelried**
**a/k/a Antonieta Winkelried**
**a/k/a Antonieta Mena**

Case No:   20-80072-CR-Marra/Matthewman

Count #: 1

### Conspiracy

18 U.S.C. § 371

** **Max. Penalty**: Up to 5 years' imprisonment, 3 years' supervised release, $250,000 fine or twice the gross gain or loss resulting from the offense, whichever is greater, and restitution.

Count #: 2

### Conspiracy

18 U.S.C. § 371

** **Max. Penalty**: Up to 5 years' imprisonment, 3 years' supervised release, $250,000 fine or twice the gross gain or loss resulting from the offense, whichever is greater, and restitution.

Count #: 3

### False Statement

18 U.S.C. § 1001

** **Max. Penalty**: Up to 5 years' imprisonment, 3 years' supervised release, $250,000 fine or twice the gross gain or loss resulting from the offense, whichever is greater, and restitution.

***Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:   **Melanie Wilhelm**

Case No:   20-80072-CR-Marra/Matthewman

Count #: 1

### Conspiracy

18 U.S.C. § 371

\*\* **Max. Penalty**: Up to 5 years' imprisonment, 3 years' supervised release, $250,000 fine or twice the gross gain or loss resulting from the offense, whichever is greater, and restitution.

Count #: 2

### Conspiracy

18 U.S.C. § 371

\*\* **Max. Penalty**: Up to 5 years' imprisonment, 3 years' supervised release, $250,000 fine or twice the gross gain or loss resulting from the offense, whichever is greater, and restitution.

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| LAURA LUZ MARIA TORRES ROMERO, | ) | |
| a/k/a Antonieta Vinkelried, a/k/a Antonieta Winkelried, | ) | **20-80072-CR-Marra/Matthewman** |
| *Defendant* | ) | |
| a/k/a Antonieta Mena | | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____

*Defendant's signature*

_____

*Signature of defendant's attorney*

Bruce Zimet

*Printed name of defendant's attorney*

_____

*Judge's signature*

_____

*Judge's printed name and title*

AO 455 (Rev 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Melanie Wilhelm | ) | |
| | ) | |
| *Defendant* | ) | 20-80072-CR-Marra/Matthewman |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

David Olson
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*